## No. 14,439.

### Brownlow et al. *v.* Wunsch et al.
(83 P. [2d] 775)

Decided October 13, 1938.

Messrs. TWITCHELL, CLARK & ECKLEY, Mr. WORTH ALLEN, for plaintiffs in error.

Mr. JAMES E. GRIFFITH, Messrs. GARWOOD & GARWOOD, Mr. BYRON G. ROGERS, Attorney General, Mr. J. GLEN DONALDSON, Assistant, for defendants in error.

*En Banc.*

Mr. Justice Knous delivered the opinion of the court.

The plaintiffs in error here seek a review of the decision of the secretary of state, upheld by the district court, arising under their protest, and holding sufficient a petition for the initiation of a proposed constitutional amendment. The defendants in error are the persons designated as representing signers of the petition involved and herein reference will be made to them as the sponsors.

The constitutional provisions relating to the initiative and referendum are contained in article V, section 1 of the Constitution. This section was adopted by popular vote at the general election in 1910 and by it the people reserved to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the general assembly. Although by express words it is declared that this section in all respects shall be self-executing, it is clearly contemplated by its terms that legislation may be enacted to further its operation. Pursuant thereto the legislature has adopted certain facilitating statutes which appear in '35 C. S. A. as chapter 86 thereof. It has generally been held by the courts of all jurisdictions that a constitutional provision for the initiative and referendum, and statutes enacted in connection therewith, should be liberally construed. *State ex rel. v. Kozer,* 108 Ore. 550, 217 Pac. 827; *Wood v. Byrne,* 60 N. D. 1, 232 N. W. 303; *Ford v. Mitchell,* 103 Mont. 99, 61 P. (2d) 815; *Laam v. McLaren,* 28 Cal. App. 632, 153 Pac. 985; *State ex rel. v. Superior Court,* 97 Wash. 569, 166 Pac. 1126.

We proceed to a determination of the controversy before us upon these considerations to the end that the constitutional right reserved to the people "may be facilitated, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right."

*State ex rel. Case v. Superior Court,* 81 Wash. 623, 632, 143 Pac. 461, Ann. Cas. 1916B 838.

 While counsel for protestants, doubtless influenced by their zeal in the presentation of their contentions, to some extent have overlooked the circumstance, in a proceeding of this character, it nevertheless is certain that neither the secretary of state nor any reviewing court should be concerned with the merit or lack of merit of a proposed constitutional amendment, since under our system of government the resolution of these questions, when the formalities for submission have been met, rests with the electorate.

On June 17, 1937, the sponsors, through the procedure prescribed by section 1, chapter 86, '35 C. S. A., obtained a ballot title and submission clause for the proposed constitutional amendment. On December 15, 1937, the sponsors filed with the secretary of state an initiative petition containing 52,598 names, asking that the secretary place the proposed amendment on the ballot to be submitted to the voters on November 8, 1938. Within fifteen days thereafter, as permitted by section 6, chapter 86, supra, the protestants filed their protest. Hearings were had on the protest and January 29, 1938, the secretary found and certified that the petition was not signed by a sufficient number of qualified electors to meet the provisions of section 1, article V of the Constitution so as to require the submission of the proposed amendment to the people. Section 1, supra, requires that "at least eight per cent of the legal voters shall be required to propose any measure by petition." The vote cast for the secretary of state at the regular general election last preceding the filing of the petition is made the basis for computation of the number of signatures of legal voters necessary to make the petition sufficient. Under this formula the number of names required to constitute a valid petition during the period here involved was 37,417. From the 52,598 names appearing on the petition as first filed, the secretary eliminated 259 names as written by others; 95 names in

which the jurat was earlier than the signature; 1079 names for faulty affidavits, and 15,666 names on sections to which were affixed affidavits, the oath to which purported to have been administered by one Irene Caffee, these latter being rejected on the ground that she was not qualified to administer the oath by reason of her interest, thus leaving 35,499 valid names on the petition. The number of valid names remaining on the petition after these deductions was insufficient to require the submission of the proposed initiated measure and the secretary so certified. Under the permission conferred by section 6, chapter 86, supra, the petition was withdrawn by the sponsors on February 2, 1938, for the purpose of amendment or the securing of additional names, and February 14, 1938, as amended, was lodged with the secretary for refiling. After the disposition of a controversy with reference to his right to refile the petition, which we will discuss later, a further protest was filed by protestants and a series of hearings thereon were held by the secretary of state. As refiled, the petition contained 10,799 new signatures and it had been amended further by the renotarizing of certain sections originally verified before Irene Caffee and stricken from the petition at the first hearing as above stated. The sponsors claimed that 7,896 signatures were thus validated and the protestants, while not admitting the validation, contended that the number thus affected was 5,579. The secretary of state determined that the correct number of signatures contained in the resworn sections was 5,355. Adding the total number of names found by the secretary to have been valid in the first hearing, to wit, 35,499, the names on sections having the second affidavit, to wit, 5,355, and the new names added after the petition was withdrawn, to wit, 10,799, resulted in a grand total of 51,653 names, from which the secretary deducted 1,418 names which were either voluntarily withdrawn or stricken by him for cause upon the second or third hearings on the protest, leaving a net total of 50,235 signatures which the secretary of

state determined to be valid. (It appears from the record that due to a mathematical error of computation, the secretary has certified 50,215 instead of 50,235, as the net number of valid names on the petition.) This being in excess of the number required to initiate a constitutional amendment the measure was certified for submission. The protestants then instituted this proceeding in the district court of the City and County of Denver to review the secretary's findings, with the result that they were affirmed and approved by that court in their entirety.

▮ The first objection presented is that the initiative petition, as amended after the first findings by the secretary holding it insufficient, was barred from being refiled on February 14, 1938, because more than six months had then elapsed subsequent to the date on which the titles and submission clauses were provided. In this connection it will be recalled that the original petition admittedly was filed within the six-month period, and in passing it may be observed that when the amended petition was tendered for filing the secretary refused to refile it upon the ground here relied upon by the protestants. The sponsors then procured an alternative writ of mandamus in the district court of the City and County of Denver commanding the secretary to file the petition, to which he presented general and special demurrers. These were overruled by the court, whereupon the secretary elected to abide by the ruling and refiled the petition. Protestants sought to intervene in the proceeding after the demurrers were overruled, but their petition to so intervene was denied by the court and its decision in this respect was affirmed by this court in *Brownlow v. Wunch,* 102 Colo. 447, 80 P. (2d) 444. The action of the district court requiring the secretary to accept the amended petition for filing, concerning which no review is pending, so far as we are advised, might possibly be considered as conclusive on this point and it further may be questioned whether upon a review of the secretary's findings as to

the sufficiency in form and number of signatures of the petition, this question can properly be raised. Notwithstanding, in view of the importance of the case and the public nature of the question involved, we do not conconsider the technical considerations suggested. Section 6, chapter 86, supra, among other things, provides: "In case the petition be declared insufficient in form or number of signatures of qualified electors, it may be withdrawn by a majority in number of the persons representing the signers of such petition, and may, within fifteen days thereafter, be amended or additional names signed thereto as in the first instance, and refiled as an original petition." This section was adopted by the General Assembly in 1913 and appears in the 1913 Session Laws at page 311. In 1919 the legislature adopted another act relating to initiated measures (chapter 131, S. L. 1919), consisting of four sections which appear as sections 1, 2 and 3 of chapter 86, '35 C. S. A., the fourth section repealing all acts or parts of acts in conflict with the provisions of the amendatory act being omitted. Section 3 of the act and of chapter 86, inter alia, provides: "No petition for any initiative measure shall be of any force or effect unless filed with the secretary of state (as provided for by the constitution) within six months from the date that the titles and submission clauses have been provided therefor pursuant to the provisions of section 1 of this chapter."

The only limitation with reference to the filing of initiative petitions appearing in the Constitution, section 1, article V, is to the effect that they "shall be * * * filed with the secretary of state at least four months before the election at which they are to be voted upon." It is indicated that the legislature had in mind this limitation when the 1919 act was adopted; otherwise the parenthetical expression "as provided for by the constitution" could have no purpose. However, by reason of the circumstance in the proceeding before us that the amended petition was filed a number of months prior to

the four-months period preceding the general election, we are not required to, and do not, determine what might be the situation where a petition, although tendered for filing within six months from the time the ballot title had been provided, transgressed by a violation of the constitutional provision requiring its filing four months before the election; nor is it necessary to ascertain in this case whether a petition filed previous to four months before election can be withdrawn for amendment and refiled within the four-months period.

Protestants argue that the provisions of section 6, chapter 86, supra, hereinabove quoted, are in conflict with the provisions of section 3, chapter 86 (1919 act), above set forth, whereby a repeal of these provisions was accomplished by section 4. They further assert that the provisions of the 1919 act, being the latest legislative expression on the subject, are controlling and that by the provisions of section 3 of that act, an amended petition must be filed within the six-months period. Section 6, chapter 86, supra, provides, among other things, that hearings on protests shall be summary and must be concluded within forty days after the filing of the petition. It further provides that in case the petition is declared insufficient in form or in the number of signatures, it may be withdrawn for amendment and within fifteen days thereafter be refiled as an original petition. It thus is evident that under the statute at least fifty-five days can elapse between the time the petition is first filed and the date it can be refiled as amended. If the sponsors of an initiated petition are required to anticipate the filing of protests and the permissible delay incident to the determination thereof, the period for the circulation of the petitions and within which the first filing must be made in effect would be reduced to about four months. We cannot believe such was the intent of the legislature.

The matter contained in the act of 1919 relating, as it does, to the procedure in procuring the title and submission clauses of initiated measures, to the fees of the

secretary of state, making ineffective the signatures to the petition affixed prior to the time the titles and submission clauses have been provided, and the limitation on filing last discussed, in no way is in conflict with any part of the act of 1913, and is merely supplementary and amendatory thereto, under which circumstance no repeal of the former act was intended or effected. The protestants attach special significance to the words of section 6. supra, providing that the rejected petition, after amendment, may be refiled "as an original petition," and say that since section 3 of the 1919 act requires the first filing of a petition within the six-months period, the amended petition, being designated an original petition, must be filed within that time. We do not consider these words have that effect. We conclude their purpose is to proclaim, that after having been refiled the amended petition, in legal effect, is to be considered as an original petition, but they do not import that status so as to invoke the limitation controlling the initial filing of the rejected original petition. At least, where no violation of the constitutional limitation is involved, we believe the statute contemplates that the sponsors have the specified six months within which to secure signatures and file their petition, and in the event of protest and rejection of the petition, at their election they are entitled, as a matter of course, to refile the petition within fifteen days even though the refiling date may fall beyond the six-months period.

■■ We now proceed to the second contention of the protestants.

The Constitution, article V, section 1, provides, inter alia: "To each of such petitions, which may consist of one or more sheets, shall be attached an affidavit of some qualified elector, that each signature thereon is the signature of the person whose name it purports to be, and that to the best of the knowledge and belief of the affiant, each of the persons signing said petition was at the time of signing, a qualified elector. Such petition so verified

shall be prima facie evidence that the signatures thereon are genuine and true and that the persons signing the same are qualified electors.''

The statute, section 6, chapter 86, supra, relating to this subject, contains the statement: ''All petitions, so verified, shall be deemed and held sufficient if they appear to be signed by the requisite number of signers, and such signers shall be deemed and held to be qualified electors, unless a protest in writing under oath shall be filed in the office in which such petition has been filed, by some qualified elector, within fifteen days after such petition is filed, setting forth specifically the grounds of such protest and the names protested; * * *. Hearings shall be summary and must be concluded within forty days after such petition is filed, and the result thereof shall be forthwith certified to the persons representing the signers of such petition.''

To each section of the petition found sufficient by the secretary, was attached an affidavit, in the body of which it was recited that the signer ''is a qualified elector in and for the State of Colorado.'' The protestants contend that such statement is insufficient to establish even prima facie that the maker of the affidavit is in fact a qualified elector, and assert that in the case of a petition not protested it is incumbent upon the sponsors to produce before the secretary evidence aliunde to the effect that each and every of the persons who verified under oath the many sections of an initiated petition are in fact qualified electors before the petition lawfully can be filed by the secretary. Under their construction of section 6, supra, they further insist that even if such independent proof is produced by the sponsors upon the initial presentation of the petition for filing, and each and every of the affiants is found by the secretary to be a qualified elector, that in the event a protest is filed the prima facie case thus established is immediately nullified and the burden again is upon the sponsors to establish aliunde that all of the persons swearing to the affidavits are qualified electors.

When it is considered that the unquestioned purpose of the initiative and referendum act was to expeditiously permit the free exercise of legislative powers by the people, and the procedural statutes were adopted to facilitate the exercise of this right, it is inconceivable that either the framers of the Constitution or the legislature contemplated the cumbersome and expensive procedure suggested by protestants as one of the formalities preliminary to the submission of an initiated measure. Rather it was intended, we feel, that the identity of the affiant as being a qualified elector might be established prima facie by a recital to that effect in the affidavit. It is certain under the express words of the Constitution that a petition so verified shall be prima facie evidence that the signatures thereon are genuine and the persons signing the same are electors. We cannot import to the words of section 6, supra, providing for protest, the meaning, that upon the filing thereof the previously existing prima facie valid status of the petition is ipso facto destroyed and the burden of proof with respect thereto shifted to the sponsors. There is nothing in the Constitution or statutes, which distinguishes the protest proceedings in the case of initiated petitions from protests generally, either in administrative or judicial proceedings, wherein as an ordinary incident thereof the burden of establishing the grounds for protest rests upon the protestants. Further, our statutes relating to administrative and judicial procedure, are replete with provisions in which the prima facia probity of an instrument is established by verification or affidavit without the requirement that the identity of the affiant be independently established.

The case of *Ahern v. Directors,* 39 Colo. 409, 89 Pac. 963, in which we held, in connection with the organization of an irrigation district, that the oral testimony or depositions of the actual signers of the petition were necessary to establish the fact that they were electors, has no bearing upon the situation here, since that case was decided under a special statute which made no provision for the

verification of the petitions, and proclaimed no prima facie validity therefrom as does both the Constitution and statutes relating to the initiative and referendum. As applying to initiated measures, such a rule would definitely tend to destroy this reserved right, in that it would be extremely unlikely that 37,414 electors as a matter of practical consideration ever could or would appear before the secretary in person as witnesses, or testify by deposition that they were qualified electors.

The protestants assert that the petition fails to comply with the statute as to form. Section 5, chapter 86, '35 C. S. A., provides as follows: "Petitions shall be printed on pages eight and one-half inches wide by fourteen inches long, with a margin of two inches at the top for binding." Protestants say that instead of having a margin of two inches at the top, the margin on the pages making up this petition is approximately one inch only. So far as we are able to determine no proof was offered on this subject and apparently we are expected to examine the petition and measure the questioned margins, which we have done. According to our measurements the pages are eight and one-half inches wide by thirteen and fifteen-sixteenths inches long. The margin upon the front or title page of each section of the petition measures two inches from the top of the binding and upon the pages containing the signatures the topmost line of the printed form is one and five-sixteenths inches from the top of the sheet, and the line upon which the first signature is written is two and one-sixteenth inches from the top of the sheet. Our examination, with the result as above indicated, discloses a substantial compliance with the statutory provisions and we give no further consideration to this objection.

The protestants next contend that to make the valid verification required by the provisions of section 1, article V of the Constitution, and section 4, chapter 86, supra, the affiant must be personally acquainted with each and every signer on that petition and know the

signatures to be genuine. The secretary and the trial court held that it was unnecessary for the circulator to actually know the signers on the section of the petition verified by him. They found and held that if some person unknown to the circulator writes a purported name in the presence of the circulator the latter truthfully makes the affidavit. The constitutional provision quoted on page 129 of this opinion, so far as pertinent, requires, inter alia, the verifying affidavit to state "that each signature thereon is the signature of the person whose name it purports to be." Immediately following the last quoted words other language of the same sentence permits the portion of the affidavit dealing with the petition signers being qualified electors to be made "to the best of the knowledge and belief of the affiant." Because of this circumstance protestants say that actual acquaintance is required as a basis for the affidavit relating to the signature; otherwise the liberal requirements as to knowledge concerning the status of the signer as an elector would not have been prescribed. Practical considerations may well account for this differentiation. The status of elector is founded upon a considerable number of technical requirements only determinable by research and investigation and in the great majority of cases, no matter how well the affiant might know signer, the affidavit would necessarily be upon information and belief. However, the circulator can make a positive affidavit that the signature was the genuine signature affixed by the signer by reason of its having been written in his presence or through his familiarity with the signer's handwriting. Irrespective of these considerations we believe the same result is required by the words of the Constitution, and in this connection we quote with approval the following excerpt from the findings of the secretary: "The key to the proper meaning of the phrase would seem to be in the correct interpretation to be given to the word 'purport.' Webster's New International Dictionary defines 'purport' as follows: 'To have the appear-

ance or convey the impression of being; as, the letter purports to be from the president.' ''

Rephrased, the clause in question would read, ''that such signature thereon is the signature of the person whose name it has the appearance or conveys the impression of being.'' That clearly is not the direct expression of a fact such as that for which counsel for protestants contend, but merely is a requirement that the affidavit directly state that the signature was personally affixed in the presence of the circulator by a person representing himself to be identifiable by the name signed to the petition or that the signature was known to the circulator as being that of the person affixing it to the section. The standard as to the degree of acquaintance required of an affiant verifying initiated petitions is a proper matter for constitutional or statutory definition, as a consequence of which the requirements vary in the different states. The case of *Wood v. Byrne*, 60 N. D. 1, 232 N. W. 303, construing a North Dakota statute which, generally speaking, is similar to our constitutional provision, supports the conclusion we have reached. The cases of *State ex rel. v. Snell*, 155 Ore. 300, 60 P. (2d) 964; *State ex rel. v. Graves*, 89 O. St. 24, 107 N. E. 1018; *Morford v. Pyle*, 53 S. D. 356, 220 N. W. 907, and *O'Brien v. Pyle*, 51 S. D. 385, 214 N. W. 623, cited by protestants involve statutes requiring that to lawfully make the affidavit the affiant must have a personal acquaintance with the signers of the petition, have no authoritative effect in this proceeding.

The petition is further challenged upon the alleged ground that it is permeated with fraud. The section of the protest upon which this contention is based contains not a single name, section number, or line number by means of which either the secretary or sponsors could ascertain the names protested, nor does the protest contain specifically the grounds thereof. Section 6, chapter 86, supra, requires the protest to set forth ''specifically the grounds of such protest and the names protested.'' In *Ramer v. Wright*, 62 Colo. 53, 159 Pac. 1145,

we held that, ''These requirements are clearly jurisdictional, and the secretary of state is without power to act in the absence of a substantial compliance with these requirements of the statute.'' Some evidence tendered on this issue was rejected and other testimony stricken upon this ground. To meet this contingency the protestants sought permission to amend the protest after the expiration of the period allowed for filing the same, which request was denied—rightly we think—by the secretary upon the ground that the statute makes no provisions for such amendment. Notwithstanding this deficiency in the protest and with a view of ascertaining whether general fraud permeated the petition, the secretary at a hearing specially provided for that purpose, with great liberality permitted protestants to present evidence on this issue. In the protest it is charged that each and all of the sections of the petition should be stricken and held for naught for the reason that the conduct of the sponsors and their agents, including Irene Caffee and Herbert L. Caffee, in the circulating, preparation, procuring, filing and refiling of said petitions was permeated by fraud. The evidence discloses that Irene Caffee was in charge of the Denver office for the sponsors and obtained a number of circulators through advertisements inserted in the Denver Post in which it was stated, ''no experience necessary,'' and that she paid circulators two cents for each name obtained by them and retained one cent for herself. Herbert L. Caffee, father of Irene, worked with his daughter at various times and during the circulating of petitions. After the first hearing, as we have mentioned, the secretary found that Irene Caffee was not a competent notary because of her interest, and rejected all sections, which contained in excess of 15,000 names, and on which appeared the affidavit purported to have been sworn to before her; also, as has been mentioned, a number of these sections of the petition were later renotarized by Herbert L. Caffee and a portion thereof accepted by the secretary in the hearing on the second protest. This matter will

later be discussed herein. To the extent that the fraud charged is premised on the advertisement for circulators and the latter being paid for names procured, without reference to our views as to the ethics of such procedure, it is sufficient to say that this practice is not prohibited by either the Constitution or statutes. It also is evident that the protestants cannot make the actions of Irene Caffee a basis for fraud since the petitions notarized by her were rejected in toto by the secretary. Additionally, the protestants claim that where the person making the verification attached to the petition was not personally acquainted with the signer thereof, which inferentially they assert was the situation with respect to many of the petitions, that a condition analogous to constructive fraud is created, as a result of which the petitions should generally be rejected. This argument, of course, is based upon their construction of the Constitution, which construction we have rejected, thereby disposing of this point. The greater part of the testimony offered or received at the hearing on the question of fraud was purely hearsay, and given by paid investigators for the protestants who had interviewed many circulators and signers of the petitions. Much of this testimony related to the circulators' lack of acquaintance with such signers, but at best it was insufficient to establish, even upon a hearsay basis, that the circulators in the great majority of instances, either did not see the signers affix the signatures or that they were not otherwise acquainted with the signatures. The evidence introduced at the hearing on this branch of the case was regarded by the secretary as insufficient to establish general fraud, but as a result of specific instances of fraud developed in connection therewith, he rejected 998 names. Our examination of the record, no abstract having been filed because of the summary consideration of the case required, convinces us that the secretary was justified in making the finding certified.

The vitality to be accorded initiated petitions is supplied by a sufficient number of valid signatures of

electors thereon. That this is the controlling factor in a protest proceeding is evident from the specifications prescribed in the statute concerning protests. This consideration also is borne out by the requirements of the Constitution and statutes to the effect that following the names of the various signers, the residence address of each signer shall be attached. Thus is provided a method whereby the protestants may check the genuineness of the signatures and the status of the purported signer as an elector. It is worthy of note that in the proceedings before us, except in certain instances where the challenged signatures were rejected by the secretary, the protestants at no time contended or showed even by hearsay testimony, that the signatures presented by the sponsors were not genuine.

 The sections of the petition here involved generally contain three pages of signatures upon the third of which appears the affidavit of the certifying elector. Upon the purported authority of *Haraway v. Armstrong,* 95 Colo. 398, 36 P. (2d) 456, the protestants assert the affidavit must appear upon *each* of the sheets and to the extent that this requirement is not fulfilled the petitions are void. Such language in that opinion as might suggest this requirement doubtless was prompted by the circumstance that the petition there involved did have a verification upon each sheet. In any event, the Constitution, section 1, article V, which controls, provides "To each of such petitions, *which may consist of one or more sheets,* shall be attached an affidavit of some qualified elector * * *."

 The protestants next contend that Herbert L. Caffee hereinabove mentioned, was disqualified to administer the oath to the persons making the elector's affidavit attached to sections of the petition by reason of his alleged direct and personal interest in the matter. His name appears as notary public upon a number of the original sections and upon some of the resworn sections originally notarized by Irene Caffee and which were re-

jected by the secretary at the first hearing. The alleged interest is largely grounded upon the circumstance that Mr. Caffee gave up fifteen days' time without compensation in an effort to obtain additional names and affidavits to the petitions. In his first and second findings the secretary held that protestants had shown no interest on the part of Mr. Caffee which disqualified him from administering the oath to circulators. At the second hearing he appeared and testified at the request of protestants. He stated that his interest in the matter was prompted by his sense of appreciation to the chiropractic profession for the improvement of his wife's health through chiropractic treatment. As was the conclusion of the district court, we fail to discover anything in the evidence which would discredit his acts as a notary public or disqualify him from acting in that capacity in connection with the petition.

Nor are we impressed by protestants' assertion that the secretary refused to hear evidence on sections numbered 1 to 715 at the hearing under the second protest. We gather that these sections comprise the portion of the petition first filed, included in the amended petition as refiled. At the hearing on the second protest it was stipulated that in determining the issues the secretary might consider all the evidence taken in the previous hearing relating to these sections (which have not been transmitted to us), and the second findings of the secretary affirmatively state that he so did consider such evidence in reaching his final conclusion. It also is admitted that evidence, relating to such of said sections as were resworn to by the circulators, was admitted. At the general hearing on the question of fraud the protestants were permitted to present evidence of fraud going to any and all sections of the petition. We find nothing in the record to indicate that protestants were at any time improperly precluded in the introduction of their proof. As we have hereinabove mentioned, the transcript is characterized by extreme liberality on the part of the secre-

tary with reference to the admission of testimony. On the limited number of occasions called to our attention where objections to testimony were sustained, offers of proof rejected, or motions to strike granted, the rulings can well be justified upon one or more of the elementary grounds of irrelevancy, incompetency or immateriality.

Accordingly, the findings of the secretary of state and the judgment of the district court approving the same, are hereby affirmed.

MR. CHIEF JUSTICE BURKE dissents. He thinks the amended petition was not filed in time.

MR. JUSTICE HOLLAND not participating.