Rita MONTERO, Plaintiff–Appellant,

v.

Natalie MEYER, Secretary of State of the State of Colorado; and State of Colorado, Defendants–Appellees,

and

Official English Committee, Barbara M. Philips, Mary Ann Carlos, Thaddeus F. Gembczynski, and Chong Cha Woodfill, Intervenors–Appellees.

No. 88SA469.

Supreme Court of Colorado, En Banc.

July 9, 1990.

Rehearing Denied Aug. 20, 1990.

Kenneth A. Padilla, Barry D. Roseman and Henry J. Feldman, Denver, for plaintiff-appellant.

Catharyn A. Baird, Denver, for defendants-appellees.

Shannon A. Robinson, P.C., Shannon A. Robinson and Jeffrey A. Esses, Denver, for intervenors-appellees.

Justice VOLLACK delivered the Opinion of the Court.

In 1987 intervenors-appellees the Official

English Committee (the intervenors)[1] filed with Secretary of State Natalie Meyer (Meyer) petitions in support of a proposed initiative to amend the Colorado Constitution to make English Colorado's official language. Plaintiff-appellant Rita Montero (Montero), a registered elector of the state of Colorado, filed a protest against the petitions, and Meyer denied the protest. Montero subsequently filed a complaint for judicial review of Meyer's denial of the protest in the Denver District Court.[2] The district court dismissed Montero's complaint. Montero then instituted this action by filing in this court, pursuant to subsection 1–40–109(2), 1B C.R.S. (1980), an application for review of the district court's order of dismissal. Montero specifically alleges that the petitions submitted in support of the proposed initiative were withdrawn and could not be re-filed before the applicable filing deadline, that Meyer improperly certified the initiative for the ballot, and that Meyer improperly dismissed Montero's amended protest.

We affirm.

## I.

The parties do not dispute the facts. On October 29, 1987, the intervenors filed with Meyer petitions in support of a proposed initiative to add the Official English Amendment (the amendment) to the Colorado Constitution. The intervenors sought to place the proposed initiative on the ballot for the November 8, 1988, election.[3] On November 13, 1987, Meyer verified that the petitions contained more than the 50,668 signatures required to place the proposed initiative on the ballot. On November 27, 1987, Montero filed a timely protest to the signatures on the petitions submitted in support of the proposed initiative on the ground that the signatures had been col-

lected in violation of the Voting Rights Act, 42 U.S.C. §§ 1971 to 1974e (1983).[4] On December 15, 1987, Meyer conducted a hearing on Montero's protest. At the hearing Meyer denied the protest and advised Montero that she had ten days to file an amended protest to the signatures. Montero did not file an amended protest to the petition signatures. Instead, Montero filed a complaint in the Denver District Court pursuant to C.R.C.P. 106(a)(4), 7A C.R.S. (1989 Supp.), challenging Meyer's decision. On May 20, 1988, the district court affirmed Meyer's denial of the protest, and specifically determined that Montero's federal Voting Rights Act claims should be filed in the United States District Court for the District of Colorado.

Montero and three other individuals (the protestants) then filed a complaint in the United States District Court for the District of Colorado claiming that Meyer had violated their rights under the Voting Rights Act by preparing, approving, and circulating, in counties subject to the bilingual provisions of the Voting Rights Act, petitions written only in English. *See Montero v. Meyer*, 696 F.Supp. 540 (D.Colo. 1988). On September 16, 1988, the United States District Court ruled in the protestants' favor and granted their request for a preliminary injunction preventing Meyer from holding an election on the initiative. *Id.* at 551. Meyer appealed the district court's ruling to the United States Court of Appeals for the Tenth Circuit.

On September 19, 1988, Meyer entered an order finding that the form of the petitions had been declared insufficient by the district court, and that the intervenors could attempt to cure the deficiencies in the petitions pursuant to subsection 1–40–109(2), 1B C.R.S. (1980).[5] Meyer's order

1. The Official English Committee is composed of four registered electors, as that term is defined in § 1–40–106, 1B C.R.S. (1980 & 1989 Supp.), designated pursuant to § 1–40–107 to represent the signers of the petitions.

2. Montero brought her complaint for judicial review under C.R.C.P. 106(a)(4), 7A C.R.S. (1989 Supp.), and § 1–40–109(2), 1B C.R.S. (1980).

3. The proposed initiative was approved by a majority vote on November 8, 1988, and is now codified at Colo. Const. art. II, § 30a, 1A C.R.S. (1989 Supp.).

4. Montero challenged more than 62,000 of the signatures collected by the intervenors.

5. Subsection 1–40–109(2) was slightly amended in 1983, but the amendment has no influence on

gave the intervenors until October 3, 1988, to rehabilitate defective petitions and file additional petitions.[6] Meyer also certified the ballot initiative to the county clerks for placement on the ballot, pursuant to section 1–40–112, 1B C.R.S. (1980).[7]

On September 20, 1988, the intervenors constructively withdrew the petitions to attempt to cure the deficiencies. The intervenors' declaration of constructive withdrawal stated that the intervenors were not conceding that the petitions they originally filed were insufficient under federal or state law, and that they were not waiving their right to appeal the entry of the preliminary injunction. The intervenors rehabilitated the petitions which were invalidated by the federal district court's ruling, and collected additional signatures. On October 3, 1988, the intervenors re-filed petitions in support of the initiative. On October 5, 1988, Meyer found that the rehabilitated petitions and the additional petitions contained almost 86,000 signatures, substantially more than the 50,668 signatures required to place the initiative on the ballot.

On October 12, 1988, the Tenth Circuit Court of Appeals reversed the federal district court and lifted the preliminary injunction. *Montero v. Meyer*, 861 F.2d 603 (10th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989). On October 12, 1988, Meyer ruled that the decision of the Tenth Circuit reinstated the signatures which had been invalidated by the district court's preliminary injunction. Meyer's order stated that Montero had until October 24, 1988, to file an amended protest. On October 24, Montero filed an amended protest which challenged the petition signatures re-filed by the intervenors on October 3, 1988. Montero's amended protest challenged the signatures on the ground that they were submitted within three months of the election in violation of Colo. Const. art. V, subsection 1(2), that

they were collected in violation of the Voting Rights Act, and that the proposed initiative violated equal protection. Montero also challenged specific signatures on various other grounds. On November 2, 1988, Meyer granted the intervenors' motion to dismiss the amended protest on the ground that it was not timely filed.

In November 1988, Montero brought an action for declaratory and injunctive relief in the Denver District Court challenging Meyer's certification of the initiative prior to the November 1988 election, and her dismissal of Montero's amended protest to the petitions. The district court dismissed Montero's complaint. Montero then filed in this court an application for review of the district court's order of dismissal.

## II.

Montero's first contention is that the intervenors' refiling of the initiative petitions on October 3, 1988, constituted an original filing. Montero argues that Meyer improperly certified the initiative for the ballot because the intervenors made this second original filing within three months of the election, in violation of article V, subsection 1(2), of the Colorado Constitution. We disagree.

Article V, subsection 1(2), of the Colorado Constitution states that "[i]nitiative petitions for state legislation and amendments to the constitution, in such form as may be prescribed pursuant to law, shall be addressed to and filed with the secretary of state at least three months before the general election at which they are to be voted upon." At the time the intervenors constructively withdrew their first filing, subsection 1–40–109(2) provided:

In case the petition is declared insufficient in form or number of signatures of registered electors, it may be withdrawn

the issues in this case. *See* 1983 Colo.Sess.Laws 373. Subsection 1–40–109(2) was substantially amended in 1989. *See* 1989 Colo.Sess.Laws 326–27.

6. Meyer's September 19 order stated that in light of the preliminary injunction the petitions contained only 36,877 valid signatures. A mini-

mum of 50,668 valid signatures were required to place the proposed initiative on the ballot.

7. Sections 1–6–202, 1B C.R.S. (1989 Supp.), and 1–40–112 required Meyer to certify the initiative to the county clerks at least 50 days before the election.

by a majority in number of the persons representing the signers of such petition and, within fifteen days after the insufficiency is declared, may be amended or additional names signed thereto as in the first instance and refiled as an original petition.

In order to address Montero's claim we must decide whether the intervenors' attempt to comply with the cure provision of subsection 1–40–109(2) by constructively withdrawing the petitions subjected the second filing of the petitions by the intervenors to the deadline contained in article V, section 1(2).

Article V, section 1(2), explicitly reserves to the people the power of the initiative. We have previously held that constitutional and statutory provisions for the initiative and the referendum should be liberally construed so that "the constitutional right reserved to the people 'may be *facilitated*, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.'" *Brownlow v. Wunsch*, 103 Colo. 120, 123, 83 P.2d 775, 777 (1938) (quoting *State ex rel. Case v. Superior Court*, 81 Wash. 623, 632, 143 P. 461, 464 (1914) (emphasis in original)); *see also City of Glendale v. Buchanan*, 195 Colo. 267, 272, 578 P.2d 221, 224 (1978) ("[t]he power of initiative is to be liberally construed to allow the greatest possible exercise of this valuable right"). Traditional principles of statutory construction are also relevant to our inquiry. Section 2–4–201, 1B C.R.S. (1980), provides:

(1) In enacting a statute, it is presumed that:

(a) Compliance with the constitutions of the state of Colorado and the United States is intended;

(b) The entire statute is intended to be effective;

(c) A just and reasonable result is intended;

(d) A result feasible of execution is intended;

(e) Public interest is favored over any private interest.

We addressed a similar question in *Brownlow*, 103 Colo. 120, 83 P.2d 775. In *Brownlow*, the Secretary of State invalidated signatures submitted by proponents of a ballot initiative. The proponents of the initiative withdrew the petitions in order to rehabilitate invalidated signatures and supply additional signatures. The proponents later re-filed the petitions, which contained approximately 7,000 rehabilitated signatures and 10,000 new signatures. Opponents of the ballot initiative attacked the re-filed petitions on the ground that they had been filed more than six months after the date on which the titles and submission clauses were provided to the Secretary of State, in violation of a state statute.[8] *Id.* at 127, 83 P.2d at 778. We rejected their argument. We noted that the deadline was not invoked a second time by the language in the cure statute providing that after amendment the petition could be re-filed "as an original petition." *Id.* at 129, 83 P.2d at 779. We stated that this language was intended to proclaim "that after having been refiled the amended petition, in legal effect, is to be considered as an original petition, but [the language does] not import that status so as to invoke the limitation controlling the initial filing of the rejected initial petition." *Id.* This court held that "the sponsors have the specified six months within which to secure signatures and file their petition, and in the event of protest and rejection of the petition, at their election they are entitled, as a matter of course, to refile the petition within fifteen days even though the refiling date may fall beyond the six-months period." *Id.*

In this case, the provision in subsection 1–40–109(2) that an amended petition may be re-filed "as an original petition" does not subject such re-filed petitions to the deadline in article V, subsection 1(2). Initially, the proponents of an initiative must submit petitions in support of the initiative which are sufficient in form and number, and which are timely under article V, sub-

8. That statute is now codified at § 1–40–104, 1B C.R.S. (1989 Supp.).

section 1(2). Petitions re-filed in response to a declaration that the petitions are insufficient in form or number of registered electors may be filed within three months of the election at which the initiative is to be voted on. *Cf. Brownlow,* 103 Colo. at 129, 83 P.2d at 779.

Our interpretation of subsection 1–40–109(2) and article V, subsection 1(2), furthers the public's initiative power. Under Montero's interpretation of subsection 1–40–109(2), proponents of an initiative would have to submit petitions in support of the initiative far enough in advance of the three-month deadline to take account of the possibility that opponents of the initiative might file one or more successful protests. This would effectively move the deadline for filing petitions in support of an initiative far ahead of the three-month deadline in article V, section 1(2), and would present additional, potentially insurmountable, difficulties for future proponents of initiative measures. *Cf. Brownlow,* 103 Colo. at 129, 83 P.2d at 779.[9]

Montero relies on *Christensen v. Baker,* 138 Colo. 27, 328 P.2d 951 (1958). In *Christensen,* the proponents of a ballot initiative submitted the petitions in support of the initiative on the last day then allowed by article V, section 1.[10] *Id.* at 28, 328 P.2d at 951. The number of signatures submitted with the petitions was far short of the total required by article V, section 1. The proponents of the initiative subsequently submitted three separate supplements containing additional signatures substantially in excess of the requisite number. Each supplement was rejected by the Secretary of State on the ground that the petitions did not contain the requisite number of signatures on a date four months prior to the date of the general election. *Id.* We upheld the Secretary of State's determination on the ground that under the plain language of article V, section 1, petitions containing an inadequate number of signatures submitted in support of a ballot initiative were invalid *ab initio,* and could not be supplemented by additional signatures pursuant to the cure statute.[11] *Id.* at 30, 328 P.2d at 952.

In this case the signatures contained in the petitions submitted by the intervenors were sufficient in form and number at the time they were originally submitted on October 29, 1987. The petitions were declared insufficient as to form by Meyer as a result of the United States District Court decision on September 19, 1988. The United States District Court decision was reversed on October 12, 1988, restoring all of the original signatures submitted in the original petitions filed in October 1987. Montero's reliance on *Christensen* is misplaced since the petitions in *Christensen* submitted originally were insufficient in number and could not be cured by subsequent filings.

### III.

Montero next argues that the Denver District Court erred in holding that the Secretary of State had the authority to certify an initiative for the ballot on the same date that she issued an official determination that the signatures submitted by the proponents of the initiative were insufficient in form to qualify that measure for the ballot. Montero relies on sections 1–40–112 and 1–6–202, 1B C.R.S. (1989 Supp.). Section 1–40–112 provides:

---

9. Montero's interpretation of § 1–40–109(2) and article V, § 1(2), also renders the 15–day time limit in the cure provision of § 1–40–109(2) superfluous. If, as Montero suggests, an amended petition submitted under § 1–40–109(2) is, in effect, an original petition which cannot be filed within three months of the election, nothing would be served by the requirement in § 1–40–109(2) that the amended petition be submitted within 15 days of its withdrawal. The 15–day time limit in § 1–40–109(2) indicates that the legislature intended to allow proponents of an initiative to cure deficiencies in the supporting petitions after the three-month deadline in article V, § 1(2).

10. At the time *Christensen* was decided, article V, § 1, required proponents of ballot initiatives to submit petitions in support of the initiative "at least four months before the election at which they are to be voted upon." *Id.* at 29, 328 P.2d at 952; Colo. Const. art. V, § 1, 1A C.R.S. (1980).

11. The cure statute was then codified at § 70–1–9, 3 C.R.S. (1954).

The secretary of state, at the time he certifies to the county clerks of the several counties the names of the candidates for state and district offices for general election, shall also certify to them the ballot titles and numbers of each initiated and referred measure theretofore filed in his office to be voted upon at such election.

Section 1-6-202 states that the Secretary of State shall, at least fifty days before any general election, "make and deliver or transmit by certified mail to the county clerk and recorder of each county a notice in writing specifying the national, state, and district officers to be elected at the general election." Montero argues that under section 1-40-112 the Secretary of State is required to certify the validity of the petitions supporting an initiated measure when she certifies the ballot titles and numbers of the measure to the county clerks. We reject Montero's argument.

Title 1 of the Colorado Revised Code establishes a series of steps which make up the initiative and referendum process. *See* § 1-40-101 to 1-40-120, 1B C.R.S. (1980 & 1989 Supp.). The Secretary of State's certification of the ballot title and number of each initiated measure under section 1-40-112 is one of the steps in that process. When the Secretary of State certifies the ballot title and number of each initiative to the county clerks, she is not required to verify that the petitions in support of the initiative satisfy every legal and constitutional requirement applicable to them. Challenges to the legal and constitutional sufficiency of the petitions supporting an initiative may be litigated up to, and after, the date of the general election. Thus, section 1-40-112 affords opponents of a proposed initiative an opportunity to challenge the initiative process without depriving the electorate of its opportunity to vote on an initiated measure.

The facts of this case illustrate this point. When Meyer certified the ballot title and number of the initiative to the county clerks, a federal district court had ruled

there was a rebuttable presumption that the petitions were insufficient due to their failure to conform to the Voting Rights Act.[12] Meyer had appealed that decision to the Tenth Circuit. The intervenors were taking advantage of the cure provisions of section 1-40-109(2) by rehabilitating signatures and collecting new signatures. Meyer submitted the initiative title to the county clerks on the deadline day prescribed by sections 1-6-202 and 1-40-112. Meyer was required to submit the initiative title to the county clerks in order to continue the initiative process, and by doing so she enabled the county clerks to prepare the election ballot pending the final outcome of Montero's suit in federal court. Meyer's action did not jeopardize Montero's remedy, because Meyer's placement of the initiative on the ballot did not divest state and federal courts of jurisdiction to invalidate the initiative after the general election if the initiative had been found to be constitutionally or statutorily infirm. § 1-40-109(2).

The Denver District Court correctly held that Meyer had the authority to certify an initiative for the ballot.

## IV.

Finally, Montero argues that Meyer improperly dismissed her amended protest to the petitions, and that Meyer was estopped from dismissing the amended protest.

Montero's arguments are based on the unusual sequence of events in this case. Montero, on November 27, 1987, filed a verified protest to the petitions on the ground that the federal Voting Rights Act had been violated and that irregularities in petition signatures violated certain Colorado statutes. On December 15, 1987, Meyer held a hearing on the verified protest. Meyer ruled that she was without jurisdiction to rule on the Voting Rights Act violations. She further ruled that the portion of the protest concerning irregularities under Colorado statutes failed to specify by petition number and line the specific signatures that were not valid under Colorado statutes. Meyer denied the protest and

**12.** The federal district court subsequently ruled that its injunction did not prevent Meyer from

certifying the initiative to the county clerks pursuant to § 1-40-112.

granted Montero ten days to file an amended protest as to the portion of the denial concerning Colorado statutes. Montero did not file an amended protest, and chose instead to appeal Meyer's ruling to the Denver District Court. On May 20, 1988, the district court affirmed Meyer's decision, and noted that the United States District Court had jurisdiction over Montero's Voting Rights Act claims. Montero then brought an action in the United States District Court for declaratory and injunctive relief.

On September 19, 1988, three days after the federal district court entered its preliminary injunction, Meyer entered an order finding the petitions insufficient in form. Meyer's order gave the intervenors until October 3, 1988, to re-file the petitions pursuant to the cure provisions of subsection 1–40–109(2). The intervenors constructively withdrew the petitions on September 20, 1988, and re-filed the original petitions and additional signatures in response to the September 19, 1988, order, on October 3, 1988.

On October 12, 1988, the date the Tenth Circuit vacated the preliminary injunction issued by the federal district court, Meyer informed Montero that she had until October 24, 1988, to file an amended protest. Montero filed an amended protest on October 24, 1988, which asserted various challenges to the sufficiency of the petitions declared valid by the Tenth Circuit. On November 2, 1988, Meyer dismissed Montero's amended protest as untimely.

■ Montero first argues that Meyer's dismissal of the amended protest constituted a denial of statutory procedural rights and fundamental fairness.

Under section 1–40–109, opponents of an initiative may file a protest with the Secretary of State, and they may amend the protest within ten days of the Secretary of State's denial of the protest. § 1–40–109(1). Opponents of an initiative may also seek judicial review of the Secretary of State's denial of a protest. § 1–40–109(2). Section 1–40–109 is intended to resolve disputes about petitions before the date of the election. In further-

ance of this purpose section 1–40–109 equips opponents of a ballot initiative with two separate means of attacking the validity of petitions submitted in support of the initiative. The statute provides an orderly process by which an opponent may protest an initiative and, upon exhaustion of administrative remedies, provides recourse to the courts. To determine whether or not Montero was denied her statutory right to a hearing on her amended protest after the Tenth Circuit ruling, we must separate the original petitions filed on October 29, 1987, from the re-filed petitions that were filed to cure those signatures on the original petitions that the federal court held were improper as to *form*.

The original petitions filed October 29, 1987, had been validated by the Secretary of State as containing 98,593 signatures. To place the question on the ballot, 50,668 signatures were needed. The United States District Court ruled that it was a rebuttable presumption that the petitions were circulated in one or more of twelve counties deemed to be bilingual, and in violation of the Voting Rights Act since petitions were not circulated in Spanish and English in those counties. Meyer determined that 36,874 signatures did not fall into the bilingual violation classification and, based on the district court's ruling, the petitions lacked 13,794 signatures needed to place the initiative on the ballot.

The Tenth Circuit Court of Appeals reinstated the original 98,593 signatures which had been protested in December 1987. To allow further protest of the original signatures after the expiration of the statutory period for such protest would violate the plain reading of the statute. The period of time which Montero had to amend her protest expired on December 28, 1987, and the statute does not authorize the Secretary of State to enlarge the time period once it has expired. Montero's failure to submit her amended protest to the original petitions within 10 days of denial of the protest on December 15, 1987, precluded her from making further objections to the original petitions under subsection 1–40–109(1). *Brownlow*, 103 Colo. at 135, 83 P.2d at 782.

The signatures obtained under Meyer's order of September 19, 1988, to cure the deficiency created by the United States District Court's order would be subject to protest if the number and form were necessary to place the proposition on the ballot. The Tenth Circuit ruling restored the original signatures filed in October 1987. *Montero*, 861 F.2d at 610. The signatures obtained to cure under the September 1988 order were not necessary, and a challenge to their validity would have been moot. *See Humphrey v. Southwestern Dev. Co.*, 734 P.2d 637, 639 (Colo.1987); *Zoning Bd. of Adjustment v. DeVilbiss*, 729 P.2d 353, 356 (Colo.1986); *Barnes v. District Court*, 199 Colo. 310, 312, 607 P.2d 1008, 1009 (1980).[13]

■ Montero also argues that Meyer was estopped from dismissing her amended protest because Meyer had notified Montero that she could file a protest on or before October 24, 1988. Meyer's action of October 12, 1988, in authorizing an amended protest as to the original petitions exceeded her statutory authority since the statute does not provide for extensions of time to file an amended protest once the time for filing has expired. § 1–40–109. Meyer could authorize a protest of the new signatures to cure the deficiency if the additional signatures were needed to place the question on the ballot. That is not the case here, however. Meyer's notice to Montero that she had until October 24, 1988, to file an amended protest as to the original petitions was not authorized by section 1–40–109. "A party cannot state a claim for relief under a theory of estoppel against a state or local government entity on the basis of an unauthorized action or promise." *Seeley v. Board of County Commissioners*, 791 P.2d 696, 701 (Colo.1990).

Judgment affirmed.

QUINN, J., dissents, and MULLARKEY, J., joins in the dissent. KIRSHBAUM, J., joins in part III. of the dissent.

**13.** Meyer's order of November 2, 1988, dismissing the protest concluded that if the protestors could have established the invalidity of every signature in the protestors' challenge and the signatures were removed, according to a count

Justice QUINN dissenting:

I respectfully dissent. In contrast to the majority, I view the actions of the Secretary of State (secretary) in certifying the initiative for the ballot, and in later dismissing Rita Montero's amended protest, as contrary to law. Considerations of basic fairness lead me to conclude that Montero should be afforded a hearing on her amended protest before the initiative measure can be validly accepted as part of the Colorado Constitution.

## I.

Because the power of the initiative is a state-created right, a review of Colorado's legal framework for the initiative and protest processes, as they existed during the events in question, should prove helpful to a proper understanding of the legal significance of the secretary's actions in this case.

## A.

Article V, section 1(2) of the Colorado Constitution states;

> The first power hereby reserved by the people is the initiative, and signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to propose any measure by petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions for state legislation and amendments to the constitution, in such form as may be prescribed pursuant to law, shall be addressed to and filed with the secretary of state at least three months before the general election at which they are to be voted upon.

This provision of the constitution is "in all respects self-executing." Colo. Const. art. V, § 1(10).

made by the Secretary of State's office, 31,695 signatures would be removed from the original petition of 98,593, leaving a balance of valid signatures of 66,898 which would be in excess of the required number of 50,668.

The version of 1–40–109(1), 1B C.R.S. (1982 Supp.), which was in effect in 1987 and 1988, provided as follows:

All petitions which have attached thereto an affidavit of some registered elector that each signature thereon is the signature of the person whose name it purports to be and that to the best of the knowledge and belief of the affiant each of the persons signing such petition was at the time of signing a registered elector shall be prima facie evidence that the signatures thereon are genuine and true and that the persons signing the same are registered electors, unless a protest in writing, under oath, is filed in the office in which such petition has been filed by some registered elector, within thirty days after such petition is filed, setting forth with particularity the grounds of such protest and the names protested. Whereupon the officer with whom such petition is filed shall forthwith mail a copy of the protest to the persons named in such petition as representing the signers thereof at the addresses therein given, together with a notice fixing a time for hearing the protest not less than five nor more than twenty days after such notice is mailed. *If, at such hearing, such protest is denied in whole or in part, the person filing the same, within ten days after such denial, may file an amended protest,* a copy of which shall be mailed to the persons named in the petition and *on which a hearing shall be held as in the case of the original protest;* but no person shall be entitled to amend an amended protest. (Emphasis added).[1]

Section 1–40–105, 1B C.R.S. (1989 Supp.), states that no amendment to the state constitution shall be submitted to the people for adoption or rejection at the polls unless the petition for the submission of the initiated amendment "is signed by registered electors in an amount equal to at least five percent of the total number of voters who cast votes for all candidates for the office

of secretary of state at the preceding general election." The secretary is required, at least fifty days before a general election, to certify to the county clerks the names and party or other designation of each candidate on the ballot. § 1–6–202(1), 1B C.R.S. (1989 Supp.). At the same time, the secretary is also required to certify to the county clerks "the ballot titles and numbers of each initiated and referred measure theretofore filed in [the secretary's] office to be voted upon at such election." § 1–40–112, 1B C.R.S. (1980).

### B.

In October 1987, the Official English Committee submitted to the secretary signed petition forms containing signatures in support of an initiative petition for a constitutional amendment declaring the English language to be the official language of the state of Colorado. On November 27, 1987, Montero filed a timely protest to the petition, and the secretary conducted a protest hearing on December 15, 1987. The purpose of the hearing was to determine whether the initiative petition contained a sufficient number of valid signatures for placement of the initiative measure on the ballot at the general election on November 8, 1988. When it became apparent during the protest hearing that Montero was claiming that the petition forms were printed in English only but were circulated in several language-minority counties in possible violation of the federal Voting Rights Act, 42 U.S.C. § 1973b(f)(4) (1981) (any state subject to prohibitions against discrimination against citizens of language-minorities must provide such citizens with voting forms or other materials or information relating to the electoral process in "the language of the applicable language minority group as well as in the English language"), the secretary ruled that Montero's claim was to be determined by a federal court. The secretary then concluded the hearing and dismissed

---

1. Section 1–40–109 was substantially amended in 1989 subsequent to the secretary's order dismissing Montero's amended protest. The present protest procedures are located in the

1989 Supplement to Volume 1B of the Colorado Revised Statutes. The other statutes referred to in the text of this dissent were in effect during the events in this case.

Montero's protest. Montero sought review of the secretary's action in the Denver District Court, which upheld the order of dismissal.

On June 10, 1988, Montero filed a claim for declaratory and injunctive relief in United States District Court for the District of Colorado. The federal district court, on September 16, 1988, entered a preliminary injunction enjoining the state of Colorado from conducting an election on the English as Official Language petition initiative. *Montero v. Meyer*, 696 F.Supp. 540 (D.Colo.1988). The secretary appealed the district court's ruling to the Tenth Circuit Court of Appeals.

September 19, 1988, is one of the critical dates in this case. On that day the secretary ruled that because the federal district court had determined that a large number of signatures on the petition forms were presumptively invalid under the federal Voting Rights Act, the Official English Committee would be permitted to submit additional signatures and to amend the petition in a manner consistent with the federal district court's ruling. The secretary further ruled that, pursuant to section 1–40–105, 1B C.R.S. (1989 Supp.), a total of 50,668 signatures were necessary to certify the initiative petition for the ballot and that the petition lacked 13,794 signatures for ballot certification. The secretary permitted the Official English Committee to withdraw the original petition and to resubmit a new petition with additional signatures. On this same day, notwithstanding the secretary's determination that the signatures were insufficient under Colorado law to place the initiative petition on the ballot, the secretary certified the English as Official Language initiative petition to the county clerks for placement on the ballot at the general election on November 8, 1988. It was the secretary's opinion that the federal district court's ruling enjoined the state from holding an election on the initiative but not from certifying the initiative for placement on the ballot. On October 3, 1988, the Official English Committee submitted additional signatures. On October 5, 1988, the secretary ruled that the additional signatures, when added to the 36,874 signatures previously determined to be valid, provided a sufficient number of signatures for placement of the petition on the ballot.

On October 12, 1988, the Tenth Circuit Court of Appeals reversed the federal district court's preliminary injunction and held that the minority language provisions of the Voting Rights Act did not apply to the English as Official Language initiative petition. *Montero v. Meyer*, 861 F.2d 603 (10th Cir.1988). On that same day the secretary issued a new ruling in which she concluded that the federal litigation was "part of the appellate process from the original protest filed in late 1987" and the effect of the circuit court's decision was to reinstate the original signatures declared presumptively invalid by the federal district court. In this ruling the secretary expressly authorized Montero to file an amended protest, and Montero did so on October 24, 1988, within the time expressly designated by the secretary. Montero's amended protest included challenges to a myriad of petition signatures on grounds authorized by Colorado law. The secretary set Montero's amended protest for hearing on November 2, 1988.

On the date of the hearing on Montero's amended protest, the secretary, acknowledging that statutory law was unclear on the issue, reversed her previous decision authorizing the amended protest and granted the Official English Committee's motion to dismiss the amended protest as untimely filed. The secretary ruled that, because a previous hearing was conducted on Montero's original protest on November 27, 1987, and her protest was dismissed at that time, Montero had ten days from the original protest hearing to file an amended protest. Noting that Montero had not filed an amended protest within the ten day period and instead had chosen to pursue remedies in state and federal courts, the secretary concluded that Montero's right to file an amended protest had been abandoned. Montero unsuccessfully sought judicial review in the Denver District Court, and thereafter applied for review by this court pursuant to section 1–40–109(2)(a), 1B C.R.S. (1989 Supp.).

## II.

In my view, the secretary acted contrary to law on September 19, 1988, when she certified the English as Official Language initiative petition for the ballot at the general election on November 8, 1988, while simultaneously finding that the signatures on the initiative petition were insufficient in number for ballot certification. Colorado's statutory scheme regarding initiative measures precluded the secretary from certifying the initiative in the absence of the requisite number of valid signatures on the petition at the time of the certification. §§ 1–40–105, 1B C.R.S. (1989 Supp.); 1–40–112, 1B C.R.S. (1980).

The secretary ruled on September 19, 1988—the fiftieth day preceding the November 8 election—that 36,874 valid signatures appeared on the initiative petition and that this number was 13,794 less than the 50,668 signatures required for certification. Nevertheless, on that same day, the secretary certified the initiative for the ballot by reasoning that the federal district court had enjoined the state from holding an election but not from certifying the initiative for the ballot. The federal district court's ruling, however, only addressed the question of whether the minority language provisions of the Voting Rights Act were applicable to the initiative petition, and not the nature and extent of the secretary's authority under Colorado law for certification of a ballot title with respect to a state constitutional amendment. It is state law, not federal law, that defines the secretary's authority, as well as the limitations on that authority, with respect to ballot certification. Having determined on September 19, 1988, that the number of signatures on the initiative petition were substantially short of the number required by Colorado law for ballot certification, the secretary was without authority to certify the initiative petition for placement on the ballot.

The fact that the Official English Committee submitted additional signatures that put the number of signatures over the minimum number required for certification does not serve, in my view, to legitimize the secretary's prior act of certification when that certification did not satisfy the express requirements of state law. The validity of the secretary's certification must be judged on its own terms at the time of the attempted certification, and not on the basis of events occurring subsequent thereto. The secretary's decision to certify the initiative for the ballot on September 19, 1988, was unsupported by the facts then existing and was contrary to Colorado statutory law.

The secretary was not without an appropriate remedy to preserve the English as Official Language initiative petition for adoption or rejection at an election. The constitutional provision with respect to the initiative is intended to be self-executing in all respects. Colo. Const. art. V, § 1(10). Once the Tenth Circuit Court of Appeals issued its decision on October 12, 1988, the secretary could have then declared the signatures on the initiative sufficient in number, and in the event the secretary thereafter heard and rejected Montero's amended protest, the secretary could have filed a petition in the Denver District Court requesting the court to set a special election on the initiative in light of the unique circumstances of the case. No such effort was made by the secretary.

## III.

Independently of the secretary's action in certifying the initiative petition for the ballot, I would apply the doctrine of equitable estoppel to this case and hold that the secretary was precluded from dismissing Montero's amended protest without providing Montero with a hearing on the merits of the amended protest. The estoppel doctrine is available against the government in order to prevent manifest injustice to a person adversely affected by governmental action. "The doctrine is founded upon principles of fair dealing and is designed to aid the law in the administration of justice where, without its aid, injustice might result." *Colorado Water Quality Control Comm. v. Town of Frederick*, 641 P.2d 958, (Colo.1982); *Denver v. Stackhouse*, 135 Colo. 289, 310 P.2d 296 (1957); *Crawford v. McLaughlin*, 172 Colo. 366, 376, 473

P.2d 725, 730 (1970). The elements necessary for a proper application of equitable estoppel to the facts of this case are the following: the secretary must have known the facts; the secretary must have intended that her conduct be acted on or must so have acted that Montero had the right to believe the secretary's conduct was so intended; Montero must have been ignorant of the true facts; and Montero must have relied upon the secretary's conduct to her detriment. *Dep't of Health v. Donahue*, 690 P.2d 243 (Colo.1984); *see City and County of Denver v. Bergland*, 695 F.2d 465 (10th Cir.1982).

All the elements of estoppel are present in this case. The secretary, who was responsible for administering the law applicable to the initiative and protest processes, undoubtedly was aware of the facts of this case. The secretary's order permitting Montero to file an amended protest not later than October 24, 1988, was such that Montero had a right to believe that the secretary's order was intended to permit the amended protest to be filed, to be set for hearing, and to be resolved on the merits. Furthermore, because the secretary obviously believed that she had the authority to authorize an amended protest, it cannot reasonably be argued that Montero had any reason to believe the secretary's decision was not authorized by law. Finally, there is every indication in the record that Montero relied upon the secretary's order by investing many hours in preparing the amended protest and suffering the obvious detriment of never being afforded an opportunity to establish the insufficiency of the requisite number of signatures on the initiative petition.

The majority reasons that because the secretary's action was unauthorized, estoppel cannot apply to the facts of this case. This conclusion, in my view, begs the question by presuming that the secretary was without legal authority to permit Montero to file the amended protest. There is nothing in Colorado statutory law expressly precluding the secretary's action in granting Montero the opportunity to file an amended protest. Indeed, the secretary in her dismissal ruling acknowledged the un-

certain state of statutory law on this issue. Arguably, section 1–40–109(1), 1B C.R.S. (1982 Supp.), which authorizes an amended protest within ten days after the secretary's denial of an original protest, was intended to apply only in those cases where the secretary had the authority to rule on the validity of the original protest. In the present case, the record is clear that the secretary explicitly ruled that she had no jurisdiction to rule on the validity of the federal question raised in Montero's original protest. Consequently, under the peculiar circumstances of this case, Montero had no alternative other than to seek relief from the federal court on that very significant aspect of her claim. The validity of the petition signatures under state law, however, was neither addressed nor determined by the United States District Court or the Tenth Circuit Court of Appeals. Given this state of the record, I cannot say with any degree of assurance that the secretary's action in authorizing an amended protest was so patently unauthorized by Colorado law as to preclude the application of estoppel principles to the facts of this case.

At the very least, the unique circumstances present here compel the application of the "unique circumstances" doctrine. We have applied that doctrine when a party reasonably relies and acts upon an erroneous or misleading statement or ruling by a trial court regarding the time for filing a motion. *Converse v. Zinke*, 635 P.2d 882 (Colo.1981). In this case, Montero, relying upon the explicit ruling of the secretary, filed an amended protest within the time authorized by the secretary, but was denied any opportunity to establish her claim, set forth in the amended protest, that the initiative petition did not validly conform to the requirements of state law for ballot certification.

IV.

I fully endorse the proposition that the people's constitutional right to the initiative process is to be liberally construed in a manner allowing the greatest possible exercise of that right. *McKee v. City of Louis-*

*ville,* 200 Colo. 525, 616 P.2d 969 (1980). Liberal construction of the right of initiative, however, should not be such as to preclude a registered elector from challenging an initiative petition on the grounds that such petition does not conform to the requirements of state law. One of the obvious purposes of the protest process is to preserve the purity of elections by protecting against mistake, fraud, and other abuses in the initiative process. *Clark v. City of Aurora,* 782 P.2d 771, 777 (Colo. 1989).

It well may be that the proponents of the English as Official Language initiative petition did obtain the sufficient number of valid signatures to place the initiative petition on the ballot for the November 1988 election. There also is a distinct possibility, however, that a sufficient number of signatures were not in conformity with state law. Unfortunately, the actions of the secretary precluded any resolution of this question and, for all practical purposes, insulated the initiative process from any meaningful judicial review.

In light of the substantial procedural infirmities inherent in the manner in which the initiative petition was certified for the ballot, and in the manner in which Montero's amended protest was summarily dismissed, I would reverse the judgment of the district court and remand this matter to that court with directions to return the case to the secretary for the purpose of conducting a hearing on Montero's amended protest, the results of which should then be certified to the district court for judicial review. I accordingly dissent from this court's affirmance of the judgment.

KIRSHBAUM, J., joins in Part III of the dissent.

MULLARKEY, J., joins in the dissent.